KONDUROS, J.:
**549 In this medical malpractice case, UniHealth Post-Acute Care of Bamberg, LLC f/k/a Bamberg County Nursing Center; United Health Services of South Carolina, Inc.; United Health Services, Inc.; and UHS-Pruitt Holdings, Inc. a/k/a UHS-Pruitt Corp. (collectively, Appellants) appeal the circuit court's determination an arbitration agreement did not apply.
**550 Appellants argue the circuit court erred in denying their motion to compel arbitration on several bases. They also maintain the circuit court erred in denying their motion to compel the deposition of Camille Hodge, Sr., one of the Respondents, whose testimony they assert is relevant to whether the arbitration agreement is binding. We affirm.
FACTS/PROCEDURAL HISTORY
Mable Hodge entered a rehabilitation facility-UniHealth Post-Acute Care of Bamberg, LLC (the Facility)-on August 31, 2010, after being hospitalized for heart and kidney problems. The Facility is owned by United Health Services of South Carolina, Inc.; United Health Services, Inc.; and UHS-Pruitt Holdings, Inc. According to her doctor's records, Mable was "well developed" and "in no real distress" and had a full range of motion in her extremities when she entered the Facility. Her husband, Camille Hodge Sr., (Husband) executed various documents related to her admission, including an Arbitration Agreement and an Admission Agreement. The Facility had an Arbitration Checklist. The first item on the checklist was "Determine competency of patient/resident." The last item on the checklist was "Secure appropriate signatures," which provided:
Competent, capable of signature -
Patient/resident must initial each page in the lower right hand corner and sign and *296 date the final page in the presence of Admissions Coordinator and one witness.
Competent, incapable of signature -
Have the patient/resident verbally confirm in the presence of two (2) healthcare center/agency witnesses that the patient/resident authorizes their family member or friend to sign on the patient/resident's behalf. Have the two (2) healthcare center/agency witnesses execute the contract.
Mable was not present at the time her husband signed these documents on the day before her admission as she was still in the hospital. Mable was competent at the time of her admission and signed additional documents on the day she arrived at the Facility. She had no health care power of attorney at that time.
In both agreements, the top of every page was labeled either "ADMISSION AGREEMENT" or "ARBITRATION
**551 AGREEMENT," respectively. The Admission Agreement was individually paginated with pages numbered 1 through 12. The Arbitration Agreement was also individually paginated with pages numbered 1 through 5. Each of these documents contained its own signature page as the last page of each agreement.
The Arbitration Agreement provided:
Any and all claims or controversies arising out of or in any way relating to this Agreement or the Patient/Resident's Admission Agreement, including the interpretation of either, or the Patient/Resident's stay at, or the care or services provided by, the Healthcare Center, or any acts or omissions in connection with such care or services, including care or services provided prior to the date that this Agreement was signed, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages, and whether sounding in breach of contract, tort, or breach of statutory or regulatory duties (including, without limitation, any claim based on an alleged violation of the state bill of rights for Patients/Residents of long-term care facilities or federal Patient/Resident's rights, any claim based on negligence, any claim for damages resulting from death or injury to any person arising out of care or service rendered by the Healthcare Center or by any officer, agent, or partner thereof acting within the scope of his or her employment, any claim based on any other departure from accepted standards of health care or safety, or any claim for unpaid nursing home charges), irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted for arbitration.
The Arbitration Agreement specified "signing of this Agreement is not a precondition to admission." The Arbitration Agreement also stated it could be revoked with notice to the Facility within thirty days. The Arbitration Agreement also noted "[i]n signing this Agreement, Patient/Resident Representative binds both Patient/Resident and Patient/Resident Representative individually." Husband signed but left blank a **552 line on the Arbitration Agreement where he was to indicate his capacity of representation.
The Arbitration Agreement also provided:
[T]his Agreement shall be governed by and enforced under federal law, specifically, the Federal Arbitration Act ( 9 U.S.C. §§ 1 - 16 ), as opposed to state arbitration law, notwithstanding any provision of state law or any other understanding or agreement between the parties. The parties specifically exclude the application of South Carolina's Uniform Arbitration Act.
The Admission Agreement stated in pertinent part:
I. This Agreement shall be construed, governed and enforced under the laws of the State of South Carolina. This Agreement together with all exhibits is the exclusive statement of the terms and conditions between the parties with respect to the matters set forth herein, and supersedes all prior agreements, negotiations, representations, tender documents, and proposals, written and oral with respect to the subject matter hereof. Variance from, or additions to, the terms and conditions of this Agreement in any written notification from Patient/Resident shall be of no effect.
J. This Agreement shall not be modified or amended in any respect by Patient/Resident *297 except by written agreement executed by Healthcare Center and Patient/Resident in the same manner as this Agreement is executed. These provisions are subject to federal and state law and may be changed periodically to comply with these laws. This Agreement may be modified or amended by Healthcare Center if Healthcare Center sends a notice of the amendment to Patient/Resident thirty (30) days prior to the implementation of the amendment. If Patient/Resident does not reject such amendment in writing within thirty (30) days of receipt of the amendment, such amendment shall be deemed accepted and incorporated into this Agreement. This Agreement shall not be assigned, directly or indirectly, by Patient/Resident without the prior written consent of Healthcare Center. Any attempted assignment by Patient/Resident not in full compliance herewith shall be void and of no force or effect. This Agreement is freely assignable by Healthcare Center.
**553 Around three weeks after her admission, after complaining of increasingly severe back pain, Mable was not able to feel her legs or arms, was unable to stand, and was ultimately transported to Richland Memorial Hospital, where hospital staff confirmed she was paralyzed from the waist down. Mable never walked again and died one year later as a result of her paralysis.
Camille Hodge, Jr. (Son)-Mable and Husband's son-was appointed personal representative of Mable's estate. Husband and Son, in his capacity as personal representative, filed a notice of intent to sue and later filed separate summons and complaints[1] against Appellants.[2] In addition to filing answers, Appellants filed a motion to dismiss and compel arbitration or alternatively, to compel arbitration and stay proceedings in both actions. Appellants also requested they be allowed to depose Husband on topics solely related to the arbitration issue.
The circuit court held a hearing on the motions and subsequently issued orders denying both the motion to dismiss or compel arbitration and the motion to compel the deposition of Husband. Specifically, the circuit court found the following facts were uncontested: (1) The Arbitration Agreement was signed only by the Facility and Husband; (2) Mable and Son did not sign the Arbitration Agreement; (3) Mable was competent at the time she was admitted to the Facility and when Husband signed Arbitration Agreement; (4) Mable had not executed a general power of attorney or health care power of attorney (or any other document giving Husband or other family members the authority to make contractual commitments or waivers on her behalf) at the time she was admitted to the Facility or when Husband signed the Arbitration Agreement; (5) Mable was a patient at Providence Hospital when Husband signed the Arbitration Agreement; and (6) the Facility presented Mable with other documents to sign at the time of her admission to it and Mable signed those but not the **554 Arbitration Agreement. Appellants filed a motion for reconsideration, which the trial court denied. This appeal followed.
STANDARD OF REVIEW
Unless the parties otherwise provide, the question of the arbitrability of a claim is an issue for judicial determination. Zabinski v. Bright Acres Assocs. , 346 S.C. 580, 596, 553 S.E.2d 110, 118 (2001). Determinations of arbitrability are subject to de novo review, but if any evidence reasonably supports the circuit court's factual findings, this court will not reverse those findings. Aiken v. World Fin. Corp. of S.C. , 373 S.C. 144, 148, 644 S.E.2d 705, 707 (2007).
LAW/ANALYSIS
I. Reliance on Unpublished Opinion
Appellants maintain the circuit court erred by denying their motion to compel arbitration for several reasons. First, they contend the circuit court erred by relying on this court's unpublished opinion in *298 Scott v. Heritage Healthcare of Estill, LLC .[3] They assert the circuit court utilized a "three-factor test" constructed from this court's statements in Scott . We disagree.
Scott involved another nursing home facility with one of the same parent entities as the defendants here. Op. No. 2014-UP-317 at 2. In that case, the personal representative of the estate of a patient who died at the facility brought suit and the defendants sought to compel arbitration. Id. The patient's sister had signed an arbitration agreement on behalf of the patient when admitting her to the facility. Id. The patient was competent when admitted to the facility, and the sister did not possess a health care power of attorney to sign either contract on her behalf. Id. In an unpublished opinion, this court affirmed the circuit court's decision the arbitration agreement was not enforceable against the personal representative of the estate, finding:
[T]he evidence reasonably supports the [circuit] court's findings that [the sister] lacked authority to enter into the [a]rbitration [a]greement on [the patient's] behalf because **555 [the patient] was competent at the time of her admission, and ... the admissions director [for the facility] ... agreed it would have been more appropriate for [the patient] to sign the contract herself because she was competent, and [the admissions director] did not know if [the sister] had a power of attorney.
Id. This court noted this determination disposed of the remaining issues on appeal. Id. at 3.
"Memorandum opinions and unpublished orders have no precedential value and should not be cited except in proceedings in which they are directly involved." Rule 268(d)(2), SCACR. However, "[a]n error is not reversible unless it is material and prejudicial to the substantial rights of the appellant." Visual Graphics Leasing Corp. v. Lucia , 311 S.C. 484, 489, 429 S.E.2d 839, 841 (Ct. App. 1993) ; see also McCall v. Finley , 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct. App. 1987) ("[W]hatever doesn't make any difference, doesn't matter.").
In the present case, the circuit court's order contained a summary of the facts from Scott and quoted a paragraph containing the Scott court's findings. The circuit court stated it found "the reasoning" of this court in Scott "persuasive." The circuit court indicated in a footnote:
The Scott case involves the same defendant, represented by the same lawyer, making the same argument that they are making before this [c]ourt today, and thus falls close to the rule's[4 ] exception. Moreover, the [c]ourt does not treat Scott as controlling precedent, but instead views it as persuasive reasoning on the precise issue presented here.
The circuit court did examine the Scott decision. But as the circuit court noted, this was an unusual situation in that some of the same parties were making the same arguments in a case with similar facts. Additionally, the circuit court did not rely solely on the Scott opinion to make its decision. It also relied on the published opinions of Coleman v. Mariner Health Care, Inc. , 407 S.C. 346, 755 S.E.2d 450 (2014), and **556 Dean v. Heritage Healthcare of Ridgeway, LLC , 408 S.C. 371, 759 S.E.2d 727 (2014) -both of which we discuss below-as well as other cases involving agency or arbitration. Further, this court in Thompson v. Pruitt Corp. , 416 S.C. 43, 784 S.E.2d 679 (Ct. App. 2016), cert. denied , S.C. Sup. Ct. Order dated Dec. 2, 2016-a published opinion filed after the circuit court's ruling-also reached the same decision as in Scott , relying on the same principles.[5] Accordingly, even if the circuit court did err in referencing the Scott opinion, any error would not be reversible because it was not prejudicial. See Visual Graphics Leasing Corp. , 311 S.C. at 489, 429 S.E.2d at 841 ("An *299 error is not reversible unless it is material and prejudicial to the substantial rights of the appellant.").
II. Equitable Estoppel
Appellants also contend the circuit court erred by denying their motion to compel arbitration because equitable estoppel bars Respondents from denying a relationship between Mable and Husband. They maintain equitable estoppel is a different concept than the estoppel discussed in Coleman . Appellants also argue the circuit court erred in finding the Arbitration Agreement was separate from the Admissions Agreement because they assert the two documents were merged. They also allege that because Husband is a beneficiary of the Estate, the claims are intertwined. We disagree.
In Thompson ,[6] the appellants asserted the circuit court should have concluded the "estate was equitably estopped **557 from refusing to comply with the [arbitration agreement]. [The] [a]ppellants argue[d] Mother benefited from the [arbitration agreement] because she was admitted to [the facility], received medical care, and became capable of enforcing the [arbitration agreement]." 416 S.C. at 58, 784 S.E.2d at 687. The court recognized a
recent conflict between the United States Supreme Court and our state courts concerning the application of state law in determining whether a non-signatory is bound by an arbitration agreement. Compare Arthur Andersen LLP v. Carlisle , 556 U.S. 624, 630, 632 [129 S.Ct. 1896, 173 L.Ed.2d 832] (2009) (holding that a nonparty to an agreement is entitled to invoke the Federal Arbitration Act (FAA) "if the relevant state contract law allows him to enforce the agreement"), and id. at 631 [129 S.Ct. 1896] ("Because 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,' the Sixth Circuit's holding that nonparties to a contract are categorically barred from [FAA] relief was error." (citation omitted) ), with Pearson v. Hilton Head Hosp. , 400 S.C. 281, 288-89, 733 S.E.2d 597, 601 (Ct. App. 2012) (decided in 2012 and holding "[b]ecause the determination of whether a non[-]signatory is bound by a contract presents no state law question of contract formation or validity, the court looks to the federal substantive law of arbitrability to resolve the question").
Thompson , 416 S.C. at 58-59, 784 S.E.2d at 687-88 (alterations by court).
The Thompson court determined the conflict was irrelevant in that case because "the doctrine of equitable estoppel d[id] not apply to [the] estate under either South Carolina law or federal substantive law concerning arbitrability." Id. at 59, 784 S.E.2d at 688. The court noted that under federal substantive law, the equitable estoppel doctrine in an arbitration setting **558 allows a party to "be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." Id. (emphasis omitted) (quoting Pearson , 400 S.C. at 290, 733 S.E.2d at 601 ). Restated, when a signatory seeks to enforce an arbitration agreement against a nonsignatory, the doctrine prevents the nonsignatory from averring *300 he or she is not bound to the arbitration agreement when he or she receives a direct benefit from a contract that contains an arbitration clause. Id.
Notably, in those opinions addressing equitable estoppel in the arbitration context, the nonsignatory's contractual benefit is not typically an alleged benefit of arbitration such as "avoiding the expense and delay of extended court proceedings" or being "capable of enforcing the [arbitration agreement]," as touted by [the] [a]ppellants in the present case-rather, the contractual benefit typically arises from another provision of the same contract that includes the arbitration provision.
Id. at 59-60, 784 S.E.2d at 688.
The court in Thompson determined the arbitration agreement in that case was
not incorporated into the [a]dmission [a]greement; therefore, [the] [a]ppellants' assertion that Mother received benefits under the [a]dmission [a]greement, i.e., being admitted to the facility and receiving medical care, is of no moment. The two agreements are independent of one another, as reflected in the language of the [arbitration agreement] indicating its execution is not a condition for being admitted to the nursing home. Further, any possible benefit emanating from the [arbitration agreement] alone is offset by the [arbitration agreement]'s requirement that Mother waive her right to access to the courts and her right to a jury trial. Therefore, equitable estoppel under federal substantive law has no application to the present case.
Id. at 60, 784 S.E.2d at 688.
The Thompson court next examined the doctrine of equitable estoppel under South Carolina law and noted the elements as to the party to be estopped are as follows:
**559 (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention , or at least expectation, that such conduct shall be acted upon by the other party; and (3) knowledge , actual or constructive, of the real facts.
Id. (emphases added by court) (quoting Boyd v. Bellsouth Tel. Tel. Co. , 369 S.C. 410, 422, 633 S.E.2d 136, 142 (2006) ). The court also provided the elements in regards to the party asserting estoppel: "(1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially." Id. at 60, 784 S.E.2d at 688-89 (quoting Boyd , 369 S.C. at 422, 633 S.E.2d at 142 ).
In Thompson , this court recognized "Mother had dementia prior to being admitted to [the facility]. Therefore, her incapacity prevented her from forming the intent or having the requisite knowledge to mislead [the] [a]ppellants or to assent to the [arbitration agreement's] terms." Id. at 60, 784 S.E.2d at 689. The court noted the appellants attempted to bypass this "fact by substituting both Daughter, in her individual capacity, and Son for Mother in the estoppel analysis." Id.
The court found the appellants' "argument necessarily implies that Daughter, in her individual capacity, or Son may serve as the legal equivalent of Mother's estate." Id. at 61, 784 S.E.2d at 689. The court noted "at least one jurisdiction has rejected this type of premise." Id. The court quoted a Maryland Court of Appeals case, which examined an argument identical to the appellants' estoppel argument:
Respondent is attempting to use equitable estoppel against [the patient's] [e]state based on actions that [patient's companion] took in her individual capacity . The fact that [the patient's companion] is now the personal representative for [the patient's] [e]state is of no moment; we will not hold this circumstance against [the patient's] [e]state. Simply put, [the patient's] [e]state is the plaintiff in this case, and Respondent has alleged no conduct on the part of [the **560 patient's] [e]state, or by [the patient's companion] in her capacity as Personal Representative of [the patient's] [e]state, that has affected Respondent's position. This, too, is a necessary element of an equitable estoppel defense.
*301 Id. (alterations and emphases added by court) (quoting Dickerson v. Longoria , 414 Md. 419, 995 A.2d 721, 743 (2010) ). This court recognized the Dickerson "court also noted the absence of evidence that the owner of the nursing home facility had changed its position for the worse based on the assertion of the patient's companion that she was acting on the patient's behalf when she signed the arbitration agreement." Id. (citing Dickerson , 995 A.2d at 743 ). The court found that "[l]ike the facility owner in Dickerson , [the] [a]ppellants have failed to show how they have changed their position for the worse based on Son's representation that he was acting on Mother's behalf when he signed the [arbitration agreement]." Id. at 61-62, 784 S.E.2d at 689. The court stated "the [arbitration agreement] was separate from the [a]dmission [a]greement, and [the] [a]ppellants represented the [arbitration agreement] to be a voluntary agreement that was not a condition to Mother's admission to the facility and was unconditionally revocable within thirty days of execution." Id. at 62, 784 S.E.2d at 689.
The Thompson court also found relevant to the equitable estoppel argument the Dickerson court's analysis as to "the facility owner's argument that the doctrine of unclean hands should apply to the patient's estate because the patient's companion was an heir to the estate." Id. at 62, 784 S.E.2d at 689. The Dickerson court explained:
Respondent notes that [the patient's companion] is "the heir of [the patient's] [e]state," suggesting that we should apply the doctrine of unclean hands because [the patient's companion] may benefit if the [e]state's claims against Respondent are successful. We decline to do so. First, as we have explained, we will not hold against the [e]state acts that [the patient's companion] may have performed in her individual capacity. Second, the [e]state may well have other beneficiaries or creditors. We will not hold [the patient's companion's] individual acts against these other entities for the same reasons.
**561 Id. at 62, 784 S.E.2d at 689-90 (alterations and emphases added by court) (quoting Dickerson , 995 A.2d at 744 n.23 ). The Thompson court determined in that case the appellants could "not hold Mother's estate responsible for any possible misrepresentations Son or Daughter may have made in their individual capacities. Therefore, the circuit court properly rejected [the] [a]ppellants' equitable estoppel theory." Id. at 62, 784 S.E.2d at 690.
In Coleman , 407 S.C. at 350, 755 S.E.2d at 452, Ann Coleman signed a number of documents, including arbitration agreements, when admitting her sister to a health care facility. Coleman brought suit after her sister's death, and the facility and its parent entities sought to compel arbitration. Id. The circuit court denied the motion to compel. Id. On appeal, the supreme court noted the "equitable estoppel argument is premised on [the appellants'] contention that, under state law, the admission agreements and the [arbitration agreements] merged." Id. at 355, 755 S.E.2d at 455. The court stated that in South Carolina,
The general rule is that, in the absence of anything indicating a contrary intention, where instruments are executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, the courts will consider and construe the documents together. The theory is that the instruments are effectively one instrument or contract.
Id. (quoting Klutts Resort Realty, Inc. v. Down'Round Dev. Corp. , 268 S.C. 80, 88, 232 S.E.2d 20, 24 (1977) ).
The Coleman court found "the documents were executed at the same time, by the same parties, for the same purposes, and in the course of the same transaction. Unless there is a contrary intention, [the] appellants are correct that there was a merger." Id. The court noted "[t]he admission agreements contain this language in a section titled 'Entirety of Agreement':"
This [a]greement, including all Exhibits hereto, and the [a]rbitration [a]greement between the Facility and the Resident, if the parties sign one, supersede all other agreements, either oral or in writing between the parties, and contain all of the promises and agreements between the **562 parties. Each party to this [a]greement acknowledges that no representations, inducements, *302 or promises have been made by any party or anyone acting on behalf of any party, that are not contained in this [a]greement or in the [a]rbitration [a]greement. This [a]greement may be amended only by a written agreement signed on behalf of the Facility and the Resident.
Id.
The supreme court found, "On its face, this clause recognizes the 'separatedness' of the [arbitration agreement] and the admission agreement, not a merger of the two contracts. Moreover, the [arbitration agreement] could be disclaimed within thirty days of signing while the admission agreement could not, evidencing an intention that each contract remain separate." Id. "By their own terms, the contracts between these parties indicated an intent that the common law doctrine of merger not apply." Id. The court also noted "[e]ven if the 'Entirety' clause creates an ambiguity as to merger, the law is clear that any ambiguity in such a clause is construed against the drafter, in this case, [the] appellants." Id. at 355-56, 755 S.E.2d at 455. The court determined the circuit court properly denied the appellants' equitable estoppel argument because no merger occurred. Id. at 356, 755 S.E.2d at 455.
In the present case, the Admissions Agreement indicated it was governed by South Carolina law, whereas the Arbitration Agreement stated it was governed by federal law. Like in Coleman , the Arbitration Agreement recognized a separatedness as it referenced the two documents separately, stating "[a]ny and all claims or controversies arising out of or in any way relating to this Agreement or the Patient/Resident's Admission Agreement. " Also, the Arbitration Agreement stated it could be revoked within thirty days, whereas the Admission Agreement contained no such indication and instead provided the Admissions Agreement could only be amended by the patient with written agreement executed by the Facility and the patient in the same manner as the Admissions Agreement was executed or if the Facility sent a notice of the amendment to the patient and the patient did not reject the amendment within thirty days. Further, each document was separately paginated and had its own signature page. Additionally, the Arbitration Agreement stated signing it was not a **563 precondition to admission. Based on all of this, we find the Admissions Agreement and Arbitration Agreement did not merge.
Moreover, we disagree with Appellants' assertion that Coleman does not address the concept of equitable estoppel. In Coleman , the appellants argued "even if Sister lacked capacity to execute the [arbitration agreement] under the [Adult Health Care Consent] Act, she is nevertheless equitably estopped to deny the [arbitration agreement]'s enforceability." Id. at 354, 755 S.E.2d at 455 (emphasis added). The supreme court noted the "[a]ppellants' equitable estoppel argument is premised on their contention that, under state law, the admission agreements and the [arbitration agreements] merged." Id. at 355, 755 S.E.2d at 455 (emphasis added). This court also applied the same reasoning in Thompson to the equitable estoppel arguments. 416 S.C. at 60, 784 S.E.2d at 688. Likewise, the same reasoning applies in the present case. Because Mable, Husband, and the Estate received no benefit from the Arbitration Agreement, equitable estoppel would only apply if documents were merged. The only agreement from which Respondents even arguably received a benefit was the Admission Agreement because Mable was admitted to the Facility as a result of it. However, because the Facility allegedly caused Mable's injuries that later led to her death, we find it difficult to find she benefited even from being admitted. Respondents are not seeking to enforce the Arbitration Agreement nor have they previously tried to do so. Further, even if the Admission Agreement and Arbitration Agreement merged, because Respondents are not suing for a breach of the Admission Agreement, they are not attempting to enforce that agreement. Therefore, the circuit court did not err in finding equitable estoppel did not bar Respondents' claims.[7]
*303 **564 III. Common Law Agency
Additionally, Appellants contend the circuit court erred in denying their motion to compel arbitration by finding there was no common law agency between Mable and Husband. They argue that because Husband had taken over many of Mable's medical affairs, he had become her agent. They also maintain the circuit court erred in failing to find the evidence established an apparent agency relationship. We disagree.
"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." Froneberger v. Smith , 406 S.C. 37, 49, 748 S.E.2d 625, 631 (Ct. App. 2013) (quoting Restatement (Third) of Agency § 1.01 (2006) ); see also Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club , 310 S.C. 132, 145, 425 S.E.2d 764, 773 (Ct. App. 1992) ("Agency ... results from the manifestation of consent **565 by one person to another to be subject to the control of the other and to act on his behalf."). "An agreement may result in the creation of an agency relationship although the parties did not call it an agency and did not intend the consequences of the relationship to follow. Agency may be proved by circumstantial evidence showing a course of dealing between the two parties." Peoples Fed. Sav. & Loan Ass'n , 310 S.C. at 145-46, 425 S.E.2d at 773. "In an actual agency case, the question is not whether the purported principal could have exercised control over its agent, but whether it did so." Jamison v. Morris , 385 S.C. 215, 222, 684 S.E.2d 168, 171 (2009) ; see also Cowburn v. Leventis , 366 S.C. 20, 39, 619 S.E.2d 437, 448 (Ct. App. 2005) ("The test to determine agency is whether or not the purported principal has the right to control the conduct of the alleged agent." (quoting Fernander v. Thigpen , 278 S.C. 140, 144, 293 S.E.2d 424, 426 (1982) ) ).
"The relationship of agency between a husband and wife is governed by the same rules which apply to other agencies[,] ... [and] no presumption arises from the mere fact of the marital relationship." Bankers Tr. of S.C. v. Bruce , 283 S.C. 408, 423, 323 S.E.2d 523, 532 (Ct. App. 1984). Under such rules, "the relationship of agency need not depend upon express appointment and acceptance thereof. Rather, the agency relationship may be, and frequently is, implied or inferred from the words and conduct of the parties and the circumstances of the particular case." Nationwide Mut. Ins. Co. v. Prioleau , 359 S.C. 238, 242, 597 S.E.2d 165, 168 (Ct. App. 2004).
Stiltner v. USAA Cas. Ins. Co. , 395 S.C. 183, 189, 717 S.E.2d 74, 77 (Ct. App. 2011) (alterations by court).
*304 "A party asserting agency as a basis of liability must prove the existence of the agency, and the agency must be clearly established by the facts." McCall v. Finley , 294 S.C. 1, 6, 362 S.E.2d 26, 29 (Ct. App. 1987). "The existence of an agency relationship is ... determined by the relation, the situation, the conduct, and the declarations of the party sought to be charged as principal." Langdale v. Carpets , 395 S.C. 194, 201, 717 S.E.2d 80, 83 (Ct. App. 2011). "[I]t is the duty of one dealing with an agent to use due care to ascertain the scope of the agent's authority." McCall , 294 S.C. at 6, 362 S.E.2d at 29 (alteration by court) (quoting **566 Justus v. Universal Credit Co. , 189 S.C. 487, 495, 1 S.E.2d 508, 511 (1939) ). "A true agency relationship may be established by evidence of actual or apparent authority." R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth. , 343 S.C. 424, 432, 540 S.E.2d 113, 117 (Ct. App. 2000). "[A]n agency may not be established solely by the declarations and conduct of an alleged agent." Cowburn , 366 S.C. at 39-40, 619 S.E.2d at 448 (Ct. App. 2005) (alteration by court) (quoting Frasier v. Palmetto Homes of Florence, Inc. , 323 S.C. 240, 245, 473 S.E.2d 865, 868 (Ct. App. 1996) ). However, "such declarations and conduct are admissible as circumstances in connection with other evidence tending to establish the agency." Fuller v. E. Fire & Cas. Ins. Co. , 240 S.C. 75, 83, 124 S.E.2d 602, 606 (1962).
In Klippel v. Mid-Carolina Oil, Inc. , 303 S.C. 127, 128-31, 399 S.E.2d 163, 164-65 (Ct. App. 1990), the circuit court granted summary judgment to respondents, who had denied in their affidavits a purported agent was actually their agent, as did the purported agent. This court determined that even though the purported agent stated in a deposition he was respondents' agent, because no other affidavits or depositions corroborated that claim, there was no question of fact as to agency and it affirmed the grant of summary judgment to respondents. Id. at 130, 399 S.E.2d at 165. This court noted, "The law is clear in this state that statements made by an agent concerning the existence or extent of his authority are insufficient standing alone to establish agency." Id. In Snell v. Parlette , 273 S.C. 317, 322-23, 256 S.E.2d 410, 413 (1979), our supreme court found "[t]he testimony of [a purported agent who signed an agreement on behalf of ten relatives] that she was acting as the agent of her ten nonresident relatives is entitled to some weight, but is insufficient without more to establish an agency relationship."
In the Dickerson case discussed above, the Court of Appeals of Maryland analyzed whether an estate was required to arbitrate its claims against a nursing home facility when the personal representative of the estate represented herself as the decedent's agent when she signed the arbitration agreement on his behalf when he was admitted to the nursing home. 995 A.2d at 725-26. In that case, the court noted:
[T]he decision to enter into an arbitration agreement primarily concerns the signatory's decision to waive his or her **567 right of access to the courts and right to a trial by jury. See Walther v. Sovereign Bank , 386 Md. 412, 872 A.2d 735, 754 (2005) (explaining that "the 'loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate' " (quoting Sydnor v. Conseco Fin. Servicing Corp ., 252 F.3d 302, 307 (4th Cir. 2001) ) ).
Dickerson , 995 A.2d at 736-37.
The Dickerson court found the facts in that case suggested the decedent "conferred on the [personal representative-]directly or through acquiescence[-]actual authority to make some decisions on his behalf" concerning medical treatments, admission into medical facilities, or his finances. Id. at 736. The court found, "This limited range of acts performed on the [decedent]'s behalf suggest that, at most, [he] may have conferred on [the personal representative] the authority to make health care and financial decisions on his behalf, but no more than that." Id.
The Dickerson court provided:
Courts in other jurisdictions have recently concluded that the decision to sign an arbitration agreement was not a health care decision, and they based that decision on the fact that signing the arbitration agreement was not a prerequisite to admission to a health care facility. In Koricic v. Beverly Enterprises-Nebraska, Inc , ..., the *305 Supreme Court of Nebraska concluded that a son who had authority to sign health care documents on behalf of his mother did not have authority to sign an arbitration agreement on her behalf. 278 Neb. 713, 773 N.W.2d 145, 149-52 (2009). In reaching that decision, the court explained that the decision to sign the arbitration agreement was not within the son's authority because the agreement "was optional and was not required for [the mother] to remain at the [nursing home] facility." Id. at 151. Similarly, the Supreme Court of Mississippi concluded in Hinyub that the decision to sign an arbitration agreement is not a "health care decision" where the patient or his agent "was not required to sign the arbitration provision to admit [the patient] to the [health care facility]." Miss. Care Ctr. of Greenville, LLC v. Hinyub , 975 So.2d 211, 218 (Miss. 2008). The Mississippi court drew a distinction between Hinyub's case and previous cases in which "the **568 arbitration provision was an essential part of the consideration for the receipt of 'health care.' " Id.
Dickerson , 995 A.2d at 738 (alterations by court except ellipsis).
The Dickerson court agreed with the reasoning of those courts, holding:
The decision to sign a free-standing arbitration agreement is not a health care decision if the patient may receive health care without signing the arbitration agreement. In such a case, the decision primarily concerns the legal rights of the patient with respect to resolving legal claims. If signing the arbitration agreement is necessary to receive health care, then the decision to sign the agreement is a health care decision because the receipt of health care depends on whether the patient agrees to arbitrate his or her claims. In that case, the decision to sign the arbitration agreement is effectively a decision about where and whether to receive health care, either from a facility that requires the patient to sign an arbitration agreement, from a facility that does not impose such a requirement, or from no facility at all.
Dickerson , 995 A.2d at 739.
When analyzing whether the decision to sign the arbitration agreement was a health care decision within the scope of the personal representative's authority to act on the decedent's behalf, the court noted the arbitration agreement was a free-standing contract, separate from the admission agreement, and explicitly stated it was not a precondition for admission. Id . The court accordingly determined "the decision to enter into the arbitration agreement was not a health care decision; instead, it primarily concerned [a] waiver of [a] right of access to the courts and [a] right to a trial by jury." Id. The court found no evidence was presented the decedent conferred on the personal representative the authority to waive those rights. Id. The court therefore concluded the personal representative "did not have actual authority to sign the arbitration agreement." Id. at 739-40.
In Curto v. Illini Manors, Inc. , 405 Ill.App.3d 888, 346 Ill.Dec. 229, 940 N.E.2d 229, 231 (2010), a wife filed a complaint against a nursing home as administrator of her deceased **569 husband's estate, and the nursing home sought to compel arbitration. The wife had signed an admission contract on the preprinted signature line that designated her as the "Legal Representative," and her husband did not sign the contract. Id. The wife had also signed a separate arbitration agreement above a line that stated "Signature of Resident Representative," while the husband did not sign the arbitration agreement. Id. The Appellate Court of Illinois found wife's signature on the nursing home documents did not confer express or implied authority to her. Id. , 346 Ill.Dec. 229, 940 N.E.2d at 233. The court noted it was joining the majority of states reviewing this issue, which
followed Dickerson 's reasoning and have concluded that a spouse or other family member did not have actual authority to sign an arbitration agreement on the resident's behalf. Koricic [278 Neb. 713] 773 N.W.2d 145 (decedent's son did not possess authority necessary to sign arbitration agreement); Hinyub , 975 So.2d 211 (daughter did not have authority to enter arbitration agreement whe[n] there was no declaration of resident's inability to manage his affairs and no power of attorney in *306 the record); Mt. Holly Nursing Ctr. v. Crowdus , 281 S.W.3d 809 (Ky. Ct. App. 2008) (spouse lacked authority to bind resident to arbitration agreement); Goliger v. AMS Props., Inc. [123 Cal.App.4th 374] 19 Cal.Rptr.3d 819 (2004) (daughter was not acting as mother's agent when she signed arbitration agreement without some evidence of authority beyond merely signing admission contracts). See also Compere's Nursing Home, Inc. v. Estate of Farish , 982 So.2d 382 (Miss. 2008) ; Sennett v. Nat'l Healthcare Corp. , 272 S.W.3d 237 (Mo. Ct. App. 2008) ; Ashburn Health Care Ctr., Inc. v. Poole [286 Ga.App. 24] 648 S.E.2d 430 (2007) ; Flores v. Evergreen At San Diego, LLC [148 Cal.App.4th 581] 55 Cal.Rptr.3d 823 (2007) ; Landers v. Integrated Health Servs. of Shreveport , 903 So.2d 609 (La. Ct. App. 2005) ; Pagarigan v. Libby Care Ctr., Inc. [99 Cal.App.4th 298] 120 Cal.Rptr.2d 892 (2002).
Curto , 346 Ill.Dec. 229, 940 N.E.2d at 234-35.
The court noted, "Even whe[n] a health care power of attorney was present, courts have concluded that the spouse lacked authority to sign the arbitration agreement ... because a health care power of attorney granted for medical decisions **570 does not confer authority to sign an arbitration agreement waiving legal rights." Id. at 234, 940 N.E.2d at 233. The court distinguished cases cited by the facility from "a minority of courts that have enforced nursing home arbitration agreements signed by a family member." Id. at 235, 940 N.E.2d at 233. The court determined:
Those cases follow the reasoning of Sovereign Healthcare of Tampa, LLC v. Estate of Huerta , 14 So.3d 1033 (Fla. Dist. Ct. App. 2009). In Sovereign Healthcare , the Florida appellate court held that a daughter-in-law had the authority to sign a contract for admission on the resident's behalf, including the arbitration agreement, in reliance on a durable power of attorney. The durable power of attorney in that case included a catch-all provision giving the attorney-in-fact the authority "to sign any and all releases or consent required." Sovereign Healthcare , 14 So.3d at 1035 ; see also Triad Health Mgmt. of Ga., III, LLC v. Johnson [298 Ga.App. 204] 679 S.E.2d 785 (2009) (signature of patient's son on arbitration agreement was enforceable whe[n] son had general power of attorney executed by father); Five Points Health Care, Ltd. v. Mallory , 998 So.2d 1180 (Fla. Dist. Ct. App. 2008) (daughter had durable power of attorney to prosecute, defend and settle all actions or other legal proceedings and to "do anything" regarding resident's estate). These cases, however, are distinguishable. In each case, there is at least some evidence of actual authority granting general powers of attorney to the spouse or family representative. Here, [the facility] has produced neither a general or property power of attorney, nor an order of guardianship authorizing [the wife] to administer her husband's legal affairs. Thus, [the wife] lacked actual authority to sign the arbitration agreement on [her husband's] behalf.
Curto , 346 Ill.Dec. 229, 940 N.E.2d at 235.
In United Health Services of Georgia, Inc. v. Alexander , 342 Ga.App. 1, 802 S.E.2d 314, 317 (2017), cert. denied , the Court of Appeals of Georgia disagreed that the daughter's previous signing of certain medical documents for her mother who had not objected amounted to an express grant of general authority to act as her agent without limitation. In Hogsett v. Parkwood Nursing & Rehabilitation Center, Inc. , 997 F.Supp.2d 1318, 1325 (N.D. Ga. 2014), the court determined **571 that even if it could be assumed a patient must have deduced her daughter had signed the documents a facility required for her admission because she had signed nothing, one cannot assume the mother "would have had the sophistication to understand that, included among the standard medical forms, would be a separate agreement to give up her right to a jury trial should the rehabilitation center be guilty of negligence," especially considering the mother's "consent to the arbitration agreement was not a prerequisite to her admission."
In Poole , 648 S.E.2d at 432, when admitting his wife to a nursing home, a husband signed the admission documents. The son, who had power of attorney, was present during the signing but testified "he did not *307 review the documents or discuss them with his father." Id. The Court of Appeals of Georgia found:
These circumstances do not reveal an agency relationship between [the husband and wife]. [The wife] was not present when her husband executed the arbitration agreement, and the mere fact that he signed on the "authorized representative" line cannot establish agency. Moreover, although [the son] was present when his father signed the document, [the facility] asserts that they did not then know that [the son] held a durable power of attorney for his mother. [The son]'s failure to object to the arbitration agreement, therefore, could not have led [the facility] to believe that [the son] had given his father apparent authority to execute the document.
Id. at 433 (citation omitted).
"[A] power of attorney should be evidenced by an instrument in writing." Matter of Celsor , 330 S.C. 497, 501, 499 S.E.2d 809, 811 (1998).
"The relationship of agency need not depend upon express appointment and acceptance thereof. Generally, agency may be, and frequently is, implied or inferred from the words and conduct of the parties and the circumstances of the particular case." Bruce , 283 S.C. at 423, 323 S.E.2d at 532 (citation omitted). "To establish apparent authority, the proponent must show (1) 'the purported principal consciously or impliedly represented another to be his agent;' (2) the proponent relied on the representation; and (3) 'there was a change **572 of position to the [proponent's] detriment.' " Thompson , 416 S.C. at 54, 784 S.E.2d at 685 (alteration by court) (quoting Froneberger v. Smith , 406 S.C. 37, 47, 748 S.E.2d 625, 630 (Ct. App. 2013) ).
Apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him.
Id. (emphasis added by court) (quoting Froneberger , 406 S.C. at 47, 748 S.E.2d at 630 ). "Either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." Id. at 54-55, 748 S.E.2d at 631 (quoting Froneberger , 406 S.C. at 47, 748 S.E.2d at 630 ). "Moreover, an agency may not be established solely by the declarations and conduct of an alleged agent." Id. at 55, 784 S.E.2d at 686 (quoting Froneberger , 406 S.C. at 47, 748 S.E.2d at 630 ).
In Thompson , this court determined "the authority conveyed by a principal to an agent to handle finances or make health care decisions does not encompass executing an agreement to resolve legal claims by arbitration, thereby waiving the principal's right of access to the courts and to a jury trial." Id. at 55, 784 S.E.2d at 686. Like Scott , Thompson also involved a nursing home facility seeking to compel arbitration with the same parent entities as those in the present case. Id. at 48, 784 S.E.2d at 682. In Thompson , a woman's daughter and son had their mother transferred from a hospital to a nursing home facility. Id. The son signed an admission agreement, an arbitration agreement, and several other documents on behalf of his mother, who suffered from dementia. Id. The mother was not present at the time as she was in the process of being transported to the facility. Id. After the mother's death, the daughter brought suit, individually and as personal representative, and the facility and its owners filed a motion to compel arbitration. Id. The circuit court denied the motion to compel, finding the son did not have authority to execute the arbitration agreement on his mother's behalf under either common law agency principles or the Adult Health Care **573 Consent Act.[8] Id. at 48-49, 784 S.E.2d at 682. This court determined "the evidence does not show that Son had either actual or apparent authority to execute the [arbitration agreement] on Mother's behalf. Therefore, the circuit court properly concluded Son did not have the authority to bind Mother to the [arbitration agreement]." Id. at 56, 784 S.E.2d at 686. *308 In the present case, at the hearing before the circuit court, the parties argued over the interpretation of the supreme court's opinion in Dean , which involved a different facility with one of the same parent entities as here. 408 S.C. at 376, 759 S.E.2d at 729-30. In that case, the circuit court denied the motion to compel arbitration for reasons not implicated in the instant case. Id. at 378, 759 S.E.2d at 731. The supreme court reversed and remanded to the circuit court for consideration of other arguments but in a footnote addressed the issue in our present case. Id. at 387, 759 S.E.2d at 736. The supreme court stated:
We are concerned that, according to the Record, the patient did not sign either the residency agreement or the [a]greement on her own behalf, despite being competent at the time, nor did Respondent possess a health care power of attorney to sign either contract on the patient's behalf. The parties did not address this issue on appeal, and Respondent's only argument that this issue should serve as an additional sustaining ground was located in a cursory footnote in her brief. Accordingly, we merely note that, on remand, the circuit court must engage in a full inquiry into this matter prior to any attempt to enforce the [a]greement.
Id. at 388-89 n.13, 759 S.E.2d at 736 n.13.
Here, the circuit court did not err in finding Husband was not Mable's agent. At the hearing, Appellants argued the evidence showed Mable authorized Husband to sign on her behalf and they had an actual or apparent agency relationship. The circuit court noted "[i]n the absence of any evidence that Mable ... gave ... [H]usband any express authority to act for her, UPAC argues that Mable ... 'represented' that ... [H]usband was authorized to act on her behalf by 'allowing' him to procure her admission to the ... [F]acility." Husband's **574 signing of the Arbitration Agreement, Admissions Agreement, and other forms does not make him Mable's agent. Mable did not have a health care power of attorney. Additionally, the Facility knew she was competent at the time of admission as indicated by the doctor's examination and allowed her to sign other forms. The record contains no evidence from the Facility that Mable , as the principal, represented Husband was her agent. Further, because Mable was competent, unlike the patient in Thompson for whom the family members were allowed to sign medical forms under the Adult Health Care Consent Act, no argument can be made the Adult Health Care Consent Act gave Husband the right to sign medical forms. Similarly, Husband did not have Mable's health care power of attorney. Moreover, even if Husband had authority to handle finances or make health care decisions, as Appellants contend is evidenced by Husband signing past healthcare documents, this court has held "the authority conveyed by a principal to an agent to handle finances or make health care decisions does not encompass executing an agreement to resolve legal claims by arbitration, thereby waiving the principal's right of access to the courts and to a jury trial." Thompson , 416 S.C. at 55, 784 S.E.2d at 686. Accordingly, the circuit court did not err in finding Husband was not Mable's agent.
IV. Third-Party Beneficiary
Appellants also assert the circuit court erred by denying their motion to compel arbitration because it incorrectly found Mable was not a third-party beneficiary of the Arbitration Agreement. At oral argument, Appellants conceded the Thompson opinion extinguished their third-party beneficiary argument. See Thompson , 416 S.C. at 57, 784 S.E.2d at 687 (holding "[a]s to the [arbitration agreement] between [the] [a]ppellants and Son in his individual capacity, 'a third-party beneficiary to an arbitration agreement cannot be required to arbitrate a claim unless the third party is attempting to enforce the contract containing the arbitration agreement.' " (quoting Dickerson v. Longoria , 414 Md. 419, 995 A.2d 721, 742 (2010) ) ); id. (finding the daughter was "not attempting to enforce the [arbitration agreement] on behalf of Mother's estate. Rather, she has asserted tort claims against [the] [a]ppellants arising out of the patient-provider relationship **575 created by the separate [a]dmission [a]greement"). Therefore, we will not address Appellants' third-party beneficiary argument. *309 V. Deposition
Appellants contend the circuit court erred by denying their motion to compel the deposition of Husband, whose testimony they assert is relevant to whether the arbitration agreement is binding. Appellants contend because Husband signed medical documents for her on other occasions, they presented evidence Mable authorized him to make medical decisions on her behalf and they should be allowed to inquire into the scope of that authority.[9] We disagree.
Parties may obtain discovery by one or more of the following methods: depositions upon oral examination or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; and requests for admissions. The frequency or intent of use of discovery methods set forth in subdivision (a) shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discovery is unreasonably burdensome or expensive taking into account the needs of the case, the amount in controversy, **576 limitations on the parties' resources, and the importance of the issues at stake in the litigation.
Rule 26(a), SCRCP.
"A trial court's rulings in matters related to discovery generally will not be disturbed on appeal in the absence of a clear abuse of discretion." Stokes-Craven Holding Corp. v. Robinson , 416 S.C. 517, 536, 787 S.E.2d 485, 495 (2016). "An abuse of discretion occurs when the trial court's order is controlled by an error of law or when there is no evidentiary support for the trial court's factual conclusions." Id .
Appellants argued before the circuit court "the evidence will show ... [Mable] authorized her husband to sign this agreement on her behalf and that there's an actual or an apparent agency there." They maintained "essentially the issue is ... was [Husband] her agent for the purposes of admitting her to the nursing home and executing this arbitration agreement.... [W]hen we take his deposition[,] the deposition will support that." They further asserted that "when [Mable] was admitted to other hospitals before, [Husband] ... executed consents and admissions agreements." They indicated they would ask Husband about these instances if they were allowed to depose him. They provided to the court documents Husband executed on Mable's "behalf for healthcare and for responsibility for paying bills and that kind of thing in other situations." Appellants asserted the documents showed Husband "was [Mable's] agent for executing these kinds of documents ." (emphasis added). Respondents contended the law in South Carolina does not allow a relative to waive a party's right to a jury trial.
The circuit court denied Appellants' motion to compel the deposition of Husband, determining:
Because the facts material to the [c]ourt's decision are not contested and because the parties submitted, without objection, all documents that they wished the [c]ourt to consider, the [c]ourt concludes that the deposition of [Husband] would not provide any additional material facts that would be helpful to the [c]ourt in reaching its decision.
*310 **577 Apparent authority occurs when the principal by written or spoken words or any other conduct, when reasonably interpreted, causes a third person to believe the principal consents to have the act done on his behalf by the person purporting to act for him. Thompson , 416 S.C. at 54, 784 S.E.2d at 685. "Apparent authority must be established based upon manifestations by the principal, not the agent. The proper focus in determining a claim of apparent authority is not on the relationship between the principal and the agent, but on that between the principal and the third party." Town of Kingstree v. Chapman , 405 S.C. 282, 314, 747 S.E.2d 494, 510 (Ct. App. 2013) (quoting R & G Constr. , 343 S.C. at 432-33, 540 S.E.2d at 118 ). "Either the principal must intend to cause the third person to believe the agent is authorized to act for him, or he should realize his conduct is likely to create such belief." Id. (quoting WDI Meredith & Co. v. Am. Telesis, Inc. , 359 S.C. 474, 478-79, 597 S.E.2d 885, 887 (Ct. App. 2004) ). "To establish apparent agency, a party must prove the purported principal has represented another to be his agent by either affirmative conduct or conscious and voluntary inaction." Id. "The crux of apparent agency is that the principal holds out to a third party the agent is acting on his or her behalf." Id. at 316, 747 S.E.2d at 511.
"[A]n agency may not be established solely by the declarations and conduct of an alleged agent." Frasier , 323 S.C. at 245, 473 S.E.2d at 868. However, "such declarations and conduct are admissible as circumstances in connection with other evidence tending to establish the agency." Fuller , 240 S.C. at 83, 124 S.E.2d at 606. "[A] power of attorney should be evidenced by an instrument in writing." Matter of Celsor , 330 S.C. at 501, 499 S.E.2d at 811. "The relationship of agency between a husband and wife is governed by the same rules which apply to other agencies[,] ... [and] no presumption arises from the mere fact of the marital relationship." Stiltner , 395 S.C. at 189, 717 S.E.2d at 77 (alterations by court) (quoting Bruce , 283 S.C. at 423, 323 S.E.2d at 532 ). "[T]he authority conveyed by a principal to an agent to handle finances or make health care decisions does not encompass executing an agreement to resolve legal claims by arbitration, thereby waiving the principal's right of access to the courts and to a jury trial." Thompson , 416 S.C. at 55, 784 S.E.2d at 686.
**578 In Klippel , 303 S.C. at 130-31, 399 S.E.2d at 165, the circuit court granted summary judgment to respondents who, along with the alleged agent, had denied in their affidavits an alleged agent was actually their agent. This court held that even though the purported agent stated in a deposition he was respondents' agent, because no other affidavits or depositions corroborated that claim, no question of fact was presented as to agency, and the court affirmed the grant of summary judgment to respondents. Id. at 130, 399 S.E.2d at 165. This court observed "statements made by an agent concerning the existence or extent of his authority are insufficient standing alone to establish agency." Id. In Snell , 273 S.C. at 322-23, 256 S.E.2d at 413, our supreme court determined "[t]he testimony of [a purported agent who signed an agreement on behalf of ten relatives] that she was acting as the agent of her ten nonresident relatives is entitled to some weight, but is insufficient without more to establish an agency relationship."
As described above, the Arbitration Agreement was not a prerequisite to admission and the Arbitration Agreement and the Admission Agreement in this case did not merge. Accordingly, signing the Arbitration Agreement was not a healthcare decision. Further, like in Dickerson , nothing indicates Mable realized Husband would sign an arbitration agreement in admitting her to the Facility.
Because apparent agency involves Mable's representations to the Facility, Husband's deposition would not add anything to that determination. Appellants argued Husband's deposition would show he was Mable's agent for the purposes of admitting her to the Facility. Appellants' argument Husband was Mable's agent revolved around his representations to the Facility and that Husband did not rebut the presumption he had the authority to execute contracts on Mable's behalf.
Appellants only evidence Husband was Mable's actual agent was based on the fact he previously had signed contracts on her behalf. Much like Dickerson , those contracts *311 cited by Appellants were all healthcare contracts or financial responsibility for bills arising out of healthcare procedures. Husband noted on many of those contracts as authority that he was the patient's husband. However, simply being married does not amount to agency. See **579 Stiltner , 395 S.C. at 189, 717 S.E.2d at 77 ("The relationship of agency between a husband and wife is governed by the same rules which apply to other agencies[,] ... [and] no presumption arises from the mere fact of the marital relationship." (alterations by court) (quoting Bruce , 283 S.C. at 423, 323 S.E.2d at 532 ) ). Further, a power of attorney must be in writing. See Matter of Celsor , 330 S.C. at 501, 499 S.E.2d at 811. Even if Husband had some authority as Appellants contend is evidenced by Husband signing these documents, this court has held "the authority conveyed by a principal to an agent to handle finances or make health care decisions does not encompass executing an agreement to resolve legal claims by arbitration, thereby waiving the principal's right of access to the courts and to a jury trial." Thompson , 416 S.C. at 55, 784 S.E.2d at 686. Moreover, like in Klippel , even if Husband provided in a deposition he was Mable's agent, this alone would not be enough to prove agency. See 303 S.C. at 130, 399 S.E.2d at 165. Therefore, the circuit court did not abuse its discretion in denying the motion to compel Husband's deposition.
CONCLUSION
Accordingly, the circuit court's denial of the motion to compel Husband's deposition and the motion to compel arbitration is
AFFIRMED.
WILLIAMS, J., and LEE, A.J., concur.

Husband's suit was for loss of consortium and Son's was for negligence and gross negligence.

They also named R. Dale Padgett, M.D., P.A. and Dr. Herbert A. Moscow as defendants, but because those defendants did not seek to compel arbitration, they are not involved in this appeal.

Op. No. 2014-UP-317, 2014 WL 3845113 (S.C. Ct. App. filed Aug. 6, 2014).

The circuit court was referencing Rule 268(d)(2), SCACR, which states: "Memorandum opinions ... have no precedential value and should not be cited except in proceedings in which they are directly involved."

The Thompson case is similar to the present case but the opinion was not released until after the filing of the briefs in the present case, and thus, it is not discussed therein.

Appellants' argument in the present case is similar to the appellants' argument in Thompson , in which they asserted
[Son] represented in the contract itself that he was authorized to sign it.... [Daughter] was present while the agreements were signed and made no effort to repudiate [Son's] representations that he was authorized to sign the agreements on [Mother's] behalf.... Now, however, [Daughter] seeks to repudiate these agreements on the basis that [Son] was not authorized to sign them on [Mother's] behalf. [Daughter] should be estopped from taking this contrary position. Additionally, ... the very last sentence of the [arbitration agreement] notes that in signing the [arbitration agreement], the Patient/Resident Representative binds both the Patient/Resident and the Patient/Resident Representative. [Son], [Daughter], and the Estate should be estopped from denying that [Son] had the authority to sign the [arbitration agreement], or that they are bound by it....
416 S.C. at 60-61, 784 S.E.2d at 689 (all alterations by court other than references to arbitration agreement).

Appellants also maintain that because Husband signed the Arbitration Agreement, his claims are subject to the Arbitration Agreement and as his claims are intertwined, the Estate should be compelled to arbitrate its claims as well. We agree with Respondents this argument is unpreserved.
"[A]n issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review." S.C.Dep't of Transp. v. First Carolina Corp. of S.C. , 372 S.C. 295, 301, 641 S.E.2d 903, 907 (2007) (quoting Wilder Corp. v. Wilke , 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ). "There are four basic requirements to preserving issues at trial for appellate review. The issue must have been (1) raised to and ruled upon by the trial court, (2) raised by the appellant, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity." Id. at 301-02, 641 S.E.2d at 907 (quoting Jean Hoefer Toal et al , Appellate Practice in South Carolina (2d. ed. 2002) ).
Appellants' specific argument was never made to the circuit court. Appellants contend in their reply brief this argument is preserved because they assert they filed two separate motions to dismiss and compel. However, their motion to dismiss and compel as to Husband's cause of action references the affidavit and materials in Son's cause of action-which makes no mention of this argument-and makes no separate arguments. The Memorandum in Support of their motion in the record references only Son as the plaintiff in the caption; that memo does not include any argument as to why Husband could be forced to arbitrate as the signor, as opposed to Son. At the hearing before the circuit court, Appellants stated "a memo was filed in the case involving the Estate but it basically covers both cases. The issue is the same in both cases." Later at the hearing, Appellants stated "the one memo [they had already argued] would be for both cases." Additionally, Appellants did not make any argument on this basis at the hearing before the circuit court. Further, the circuit court made no ruling on any such issue, and Appellants' motion for reconsideration makes no mention of this argument. Accordingly, because they never raised this specific argument as to why the Agreement could be enforced against Husband on this basis or obtained a ruling on it, this argument is not preserved.

S.C. Code Ann. §§ 44-66-10 to -80 (2018).

"[D]iscovery orders, in general, are interlocutory and are not immediately appealable because they do not, within the meaning of the appealability statute, involve the merits of the action or affect a substantial right." Grosshuesch v. Cramer , 377 S.C. 12, 30, 659 S.E.2d 112, 122 (2008). However, courts may accept appeals of interlocutory orders not ordinarily immediately appealable when appealed with a companion issue proper for review but not when the issues appealed lack a sufficient nexus. Brown v. Cty. of Berkeley , 366 S.C. 354, 362 n.5, 622 S.E.2d 533, 538 n.5 (2005). Appellants raise their motion to compel the deposition as part of their reasoning as to why the circuit court erred in denying the motion to compel arbitration. Accordingly, because it has a sufficient nexus to the appeal of the denial motion to compel arbitration, it is appropriately before this court and we will address it.